# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 2, 2022      Decided August 19, 2022

No. 21-7059

FRATERNAL ORDER OF POLICE, METROPOLITAN POLICE
DEPARTMENT LABOR COMMITTEE, D.C. POLICE UNION,
APPELLANT

v.

DISTRICT OF COLUMBIA AND MURIEL BOWSER, IN HER
OFFICIAL CAPACITY AS MAYOR OF THE DISTRICT OF
COLUMBIA,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02130)

---

*Anthony M. Conti* argued the cause for appellant. With him on the briefs was *Daniel J. McCartin*.

*Holly M. Johnson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With her on the brief were *Karl A. Racine*, Attorney General, *Loren L. AliKhan*, Solicitor General, *Caroline S. Van Zile*, Principal Deputy Solicitor General, and *Carl J. Schifferle*, Deputy Solicitor General.

2

Before: ROGERS, MILLETT, and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: This case involves federal constitutional challenges to a District of Columbia statute eliminating the right of D.C. police officers to bargain over procedures for disciplining individual officers. The police union contends that the statute violates equal protection principles, the Bill of Attainder Clause, the Contract Clause, and the Fifth Amendment Due Process Clause. We reject all the challenges.

I

The Comprehensive Merit Personnel Act (CMPA) governs collective bargaining by employees of the District of Columbia government. It allows officers of the Metropolitan Police Department, like other D.C. government employees, to unionize and engage in collective bargaining. D.C. Code § 1-617.01(b). They have done so and are represented by the plaintiff in this case, the Fraternal Order of Police, Metropolitan Police Department Labor Committee, D.C. Police Union (FOP).

The CMPA provides that "[a]ll matters shall be deemed negotiable" except for a list of rights reserved to management. D.C. Code § 1-617.08(b). Management rights include the right to "hire, promote, transfer, assign, and retain employees" as well as the right to "suspend, demote, discharge, or take other disciplinary action against employees for cause." *Id.* § 1-617.08(a). The parties have long understood the CMPA to give management full discretion over whether or how to

3

discipline officers who commit wrongdoing, while allowing for negotiation over the procedures for adjudicating it.

Article 12 of the Metropolitan Police Department's 2017 collective bargaining agreement contained detailed provisions on disciplinary procedure. *See Collective Bargaining Agreement Between the District of Columbia Metropolitan Police Department and the D.C. Police Union*, art. 12 (J.A. 90–95) (2017 Agreement). It also stated that these provisions "shall be incorporated" into successor agreements unless modified by a joint labor-management committee or, in the event of an impasse, an arbitration panel. *Id.* § 2 (J.A. 91).

The 2017 Agreement expired on September 30, 2020. Two months earlier, following the death of George Floyd while in Minneapolis police custody, the D.C. Council passed emergency legislation setting forth a wide range of police reforms. *See* Comprehensive Policing and Justice Reform Second Emergency Amendment Act of 2020 (Reform Act), D.C. Act 23-336. At issue in this case is section 116 of the Reform Act, which temporarily amends the CMPA to eliminate the right of "sworn law enforcement personnel" to bargain over disciplinary procedure. *See* D.C. Code § 1-617.08(c). The amendment applies to "any collective bargaining agreement entered into with the Fraternal Order of Police/Metropolitan Police Department Labor Committee after September 30, 2020." *Id.*[1]

---

[1] As emergency legislation, the original Reform Act expired after 90 days. Since then, the D.C. Council has re-enacted it seven times, with the most recent enactment set to expire on September 26, 2022. *See* D.C. Act 23-336 (July 22, 2020); D.C. Act 23-437 (Oct. 28, 2020); D.C. Law 23-151 (Dec. 3, 2020); D.C. Act 24-76 (May 3, 2021); D.C. Act 24-128 (July 29, 2021); D.C. Law 24-23 (Sept. 3,

4

Shortly after section 116 became law, the FOP sued to enjoin its enforcement. The union raised federal constitutional challenges based on equal protection principles, the Bill of Attainder Clause, the Contract Clause, and the Fifth Amendment Due Process Clause.

The district court rejected these claims and dismissed the case without prejudice for failure to state a claim. *Fraternal Ord. of Police, Metro. Police Dep't Lab. Comm., D.C. Police Union v. District of Columbia*, 502 F. Supp. 3d 45 (D.D.C. Nov. 4, 2020). The FOP then moved to alter the judgment so that it could amend its complaint. The district court denied the motion as futile.

The FOP appealed both decisions. We have jurisdiction under 28 U.S.C. § 1291.

II

We start with the dismissal order. We review the dismissal of constitutional claims *de novo*. *Patchak v. Jewell*, 828 F.3d 995, 1001 (D.C. Cir. 2016).

A

The FOP first raises an equal-protection challenge. The Equal Protection Clause provides that "[n]o State shall … deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Supreme Court has held that the Fifth Amendment Due Process Clause extends equal-protection principles to actions by the D.C. government. *See Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). According to

---

2021); D.C. Act 24-370 (Apr. 7, 2022); D.C. Act 24-454 (June 28, 2022).

5

the union, section 116 violates equal protection because it irrationally discriminates between police officers and similarly situated government employees. We disagree.

Legislation that covers some occupations but not others—which neither burdens fundamental rights nor makes suspect classifications—satisfies equal protection if the distinction at issue is "rationally related to a legitimate state interest." *Friedman v. Rogers*, 440 U.S. 1, 17 (1979) (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)); *see Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955) (optometrists versus opticians). Under rational-basis review, legislation carries "a strong presumption of validity." *Cent. State Univ. v. Am. Ass'n of Univ. Professors*, 526 U.S. 124, 126 (1999) (limitation on bargaining rights for college professors). "Perfection in making the necessary classifications is neither possible nor necessary." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976) (police retirement age). Absent irrationality, a law does not fail rational-basis review for being over- or under-inclusive. *Nordlinger v. Hahn*, 505 U.S. 1, 16–17 (1992). And because legislative classifications may be grounded in "rational speculation unsupported by evidence or empirical data," a challenger must negate "every conceivable basis" that might support the distinction. *FCC v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993) (cleaned up).

The FOP has failed to carry that considerable burden. The D.C. Council could rationally have concluded that section 116 furthers a legitimate interest in improving police accountability. By taking disciplinary procedures off the bargaining table, it gave management more flexibility in deciding how to consider allegations of police misconduct. And even if new procedural rules would reduce the protections for accused officers, "equal protection is not a license for courts

6

to judge the wisdom, fairness, or logic of legislative choices." *Beach Commc'ns*, 508 U.S. at 313.

The FOP disputes that police accountability motivated the Council. The union notes that the Reform Act included no legislative findings or explanation supporting the choice to curtail bargaining rights for the police while preserving those rights for other public-sector workers. The union further invokes language in a different provision of the legislation—section 101, which recounts Floyd's death from a neck restraint and then states an intent to ban such restraints in the District of Columbia. *See* D.C. Code § 5-125.01. According to the FOP, this language shows that the Council unfairly sought to impute to D.C. police concerns about misconduct elsewhere.

This argument misunderstands the basics of rational-basis review. Under that level of scrutiny, the legislature's actual motive is "entirely irrelevant"; all that matters is whether there are "plausible reasons" to conclude that the statutory classification furthers a legitimate government interest. *Beach Commc'ns*, 508 U.S. at 313–15 (cleaned up). Likewise, because ordinary legislative choices are not subject to "courtroom fact-finding," the absence of findings, studies, or statements of purpose has "no significance." *Id.* at 315 (cleaned up). In the wake of Floyd's death, the Council could rationally have concluded that the use of neck restraints "presents an unnecessary danger to the public." D.C. Code § 5-125.01. And regardless, it could rationally have concluded that preserving management control over disciplinary procedures would improve police accountability.

The FOP objects that section 116 does not apply to prison guards or protective-services officers. But they differ from police in key respects. Prison guards, for example, operate in a highly regimented and supervised environment. *See* D.C.

7

Code § 24-211.02. Protective-services officers safeguard government agencies and property. *See Cannon v. District of Columbia*, 717 F.3d 200, 203 (D.C. Cir. 2013). Given these differences, the D.C. Council could rationally have concluded that improving accountability for officers who directly police the general public on a daily basis was a more pressing concern. *See Lee Optical*, 348 U.S. at 489 ("Evils in the same field may be of different dimensions and proportions, requiring different remedies."). Likewise, it could rationally have concluded that targeting police discipline was an appropriate first step in improving accountability for all law-enforcement personnel. *Beach Commc'ns*, 508 U.S. at 316 ("the legislature must be allowed leeway to approach a perceived problem incrementally"). And because police officers make up the lion's share of workers that the union claims as similarly situated, it could rationally have concluded that the amendment would be at worst slightly under-inclusive. Under rational-basis review, any of these rationales is good enough.

B

The FOP next contends that section 116 violates the Bill of Attainder Clause, which provides that "[n]o Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. This is so, according to the union, because the amendment singles out "sworn law enforcement officers" for negative treatment and mentions the FOP by name. *See* D.C. Code § 1-617.08(c)(2). We disagree.

A bill of attainder is a law that "legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977). A law counts as a bill of attainder if it "(1) applies with specificity, and (2) imposes punishment." *Foretich v. United States*, 351

8

F.3d 1198, 1217 (D.C. Cir. 2003) (cleaned up). We focus on the second element, which turns on this three-part inquiry:

> (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes; and (3) whether the legislative record evinces a[n] … intent to punish.

*Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 851 (1984) (cleaned up). All three considerations cut against the FOP.

For starters, section 116 lies far from the historical meaning of legislative punishment. In the 1700s, the British Parliament used bills of attainder to sentence specific individuals to death, often as punishment for attempting to overthrow the government. *United States v. Brown*, 381 U.S. 437, 441 (1965). Over time, American courts extended the Bill of Attainder Clause to legislation imposing less severe punishment, like "banishment, imprisonment, denial of the right to vote, or confiscation of property." *Kaspersky Lab, Inc. v. DHS*, 909 F.3d 446, 454 (D.C. Cir. 2018). The change made by section 116—giving management greater control over procedure for disciplining employees—is not remotely analogous to any of these historically grounded categories.

The second factor turns on whether the statute has "punitive purposes" or "merely burdensome effects." *Kaspersky*, 909 F.3d at 455. It parallels the rational-basis inquiry in some respects, by asking whether the law "reasonably can be said to further nonpunitive legislative purposes," *Nixon*, 433 U.S. at 475–76, and whether it is "overbroad" or "underinclusive," *Kaspersky*, 909 F.3d at 455–

9

56. But we have also described this test as "more exacting" than rational-basis review. *BellSouth Corp. v. FCC*, 144 F.3d 58, 67 (D.C. Cir. 1998). Seeing opportunity in that distinction, the FOP recycles its equal-protection arguments about means-ends scrutiny.

To no avail. Any differences between police and other law enforcement officers fall far short of showing the kind of "grave imbalance" that might suggest a hidden punitive purpose. *Foretich*, 351 F.3d at 1222; *see also Kaspersky*, 909 F.3d at 456 ("the Bill of Attainder Clause does not require narrow tailoring"). Moreover, aspects of section 116 affirmatively undermine any such inference. For one thing, that provision leaves in place significant "protective measures" for police officers, *Foretich*, 351 F.3d at 1222, such as the right not to be "fired, demoted, or suspended without cause," *Burton v. Off. of Emp. Appeals*, 30 A.3d 789, 792 (D.C. 2011); *see* D.C. Code §§ 1-616.51–52. For another, section 116 "lasts only temporarily." *See Kaspersky*, 909 F.3d at 456. And while it has now been reenacted on several occasions, each new iteration has been limited to the 90-day period for emergency legislation or the 225-day period for temporary legislation, thus barring long-term change absent later legislative action. *See* D.C. Code § 1-204.12(a); *United States v. Alston*, 580 A.2d 587, 590–91 (D.C. 1990). With full view of what section 116 has and has not changed, we cannot infer that the Council acted with an illicit punitive purpose.

The third factor asks whether "the legislative record evinces a[n] … intent to punish." *Selective Serv. Sys.*, 468 U.S. at 852. But given the practical and theoretical concerns about using legislative history to divine a legislature's "collective purpose," this factor has weight only if the record shows "unmistakable evidence of punitive intent." *Kaspersky*, 909 F.3d at 463 (quoting *Foretich*, 351 F.3d at 1225).

10

The FOP offers two arguments to satisfy this heavy burden. First, it again points to section 101, which it says betrays an intent to punish D.C. police officers for the misconduct of officers in Minneapolis. As noted above, section 101 simply expresses the Council's intent to prospectively "ban the use of neck restraints by law enforcement" in the wake of Floyd's death from such a restraint. D.C. Code § 5-125.01. That hardly suggests an intent to punish anyone. Second, the FOP asserts that the Reform Act was passed as emergency legislation without any real emergency. But the Council has significant leeway to pass emergency legislation to protect the public safety or welfare, *see Alston*, 580 A.2d at 590–91, and we deferentially review its decision to do so, *see Barnes v. District of Columbia*, 102 A.3d 1152, 1154 (D.C. 2014). The union makes no serious effort to show that the Council acted beyond its discretion. Again, we can discern no express or hidden intent to punish.

C

The FOP next contends that section 116 violates the Contract Clause, which provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Home Rule Act extends the Contract Clause to the District of Columbia. D.C. Code § 1-203.02.

The Contract Clause "applies only to laws with retrospective, not prospective, effect." *Loc. Div. 589, Amalgamated Transit Union v. Mass.*, 666 F.2d 618, 637 (1st Cir. 1981) (Breyer, J.); *see Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213 (1827). The initial CMPA amendment had only prospective effect: It became effective in June 2020, and it applied only to collective bargaining agreements entered into after the parties' 2017 Agreement expired on September 30,

11

2020. D.C. Act 23-336, § 116(c)(2). And the FOP points to no successor agreement allegedly impaired by the later iterations of section 116.

Instead, the union argues that all iterations of section 116 violate the Contract Clause because they impair rights under the expired 2017 Agreement. The FOP points to article 12 of that agreement, which provided that the existing disciplinary procedure "shall be incorporated into any successor" agreement unless changed through a prescribed process. 2017 Agreement, art. 12, § 2 (J.A. 91). According to the union, article 12 made it impermissible for the Council to authorize new rules governing future bargaining over successor agreements.

We disagree. Retrospective laws violate the Contract Clause only if they "substantially" impair existing contract rights. *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). Whether impairment is substantial turns in part on the parties' reasonable expectations. *Id.* Here, the union could not have reasonably expected to insulate itself from legal changes after the 2017 Agreement had expired by its terms. For one thing, the Contract Clause does not give parties the right to contract out of generally applicable laws in perpetuity. *See Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934); *Amalgamated Transit*, 666 F.2d at 638 ("It is difficult to believe that the parties to the agreement thought they could bind their successors forever."). Moreover, the D.C. government has heavily regulated collective bargaining for decades, so the union was on notice that future statutory changes were likely. *See Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983); *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940). When signing the 2017 Agreement, the union could reasonably

12

expect that its terms would last for the duration of the agreement, but not longer.

In addition, we consider whether the law at issue serves a "significant and legitimate public purpose." *Sveen*, 138 S. Ct. at 1822. In many respects, section 116 is like other state laws that have survived past Contract Clause challenges. For one thing, it deals with a "broad, generalized economic or social problem," and it operates in an area "already subject to state regulation." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249–50 (1978). For another, its changes were neither "immediate" nor "retroactive." *Id.* In sum, section 116's prospectivity, its modest effect on the 2017 Agreement, and its legitimate purposes together doom the challenge here.

D

Finally, the FOP contends that section 116 violates the Due Process Clause of the Fifth Amendment, which provides that "[n]o person shall … be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. The union invokes cases suggesting that laws causing "grave unfairness" violate substantive due process. *Tri Cnty. Indus. v. District of Columbia*, 104 F.3d 455, 459 (D.C. Cir. 1997).

The doctrine of substantive due process is narrow. *See Abigail Alliance for Better Access to Developmental Drugs v. Von Eschenbach*, 495 F.3d 695, 702 (D.C. Cir. 2007) (en banc). We have found no cases invalidating state action under the grave-unfairness test advocated by the union. And there are several cases rejecting substantive due process claims resting on assertions of grave unfairness.[2] What we have said above

---

[2] *See Zevallos v. Obama*, 793 F.3d 106, 118 (D.C. Cir. 2015); *Elkins v. District of Columbia*, 690 F.3d 554, 561–62 (D.C. Cir. 2012); *Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson*,

13

is enough to show that section 116 is not gravely unfair: it implicates no fundamental rights, it imposes no punishment, and it has only modest prospective effect on past contractual arrangements. In addition, the union makes no argument that the right to bargain collectively over disciplinary procedures is "deeply rooted in this Nation's history and tradition." *Abigail Alliance*, 495 F.3d at 697 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).

III

After the district court rejected the union's claims on the merits, it dismissed the case without prejudice. The FOP sought to amend its complaint, which would have required the court first to amend its judgment under Federal Rule of Civil Procedure 59(e). *See Ciralsky v. CIA*, 355 F.3d 661, 668 (D.C. Cir. 2004). The court refused, concluding that the union's proposed amendments would not cure the flaws in its case. We review *de novo* this determination of futility. *See Osborn v. Visa Inc.*, 797 F.3d 1057, 1062–63 (D.C. Cir. 2015).

Start with the equal protection claim. The proposed amended complaint added allegations that police, prison guards, and protective-services officers all carry firearms and that prison guards are more likely to use force than police. But this minor elaboration hardly negates "every conceivable rationale" for treating police differently. *See Beach Commc'ns*, 508 U.S. at 315. For example, the Council could have concluded that police discipline was more pressing because the police exercise "all the common-law powers of constables"

---

475 F.3d 341, 353 (D.C. Cir. 2007); *George Wash. Univ. v. District of Columbia*, 318 F.3d 203, 209 (D.C. Cir. 2003); *Wash. Teachers' Union Local No. 6 v. Bd. of Educ.*, 109 F.3d 774, 781 (D.C. Cir. 1997); *Silverman v. Barry*, 845 F.2d 1072, 1080 (D.C. Cir. 1988).

14

against the population at large, D.C. Code § 5-127.04(a), while prison guards and protective services interact with only a narrow subset of the population.

For the attainder claim, the FOP offers a handful of comments from members of the D.C. Council. The two most noteworthy come from one member who stated that "there are police in the District who are bad actors and who have been going on without the proper penance." J.A. 534. The same member also expressed a desire, after hearing about an officer who allegedly testified falsely to secure a conviction, "to have some kind of retribution or some kind of justice in this criminal justice system." *Id.*

Neither of these statements suggests that section 116 was punitive. For starters, the statements express no desire to legislatively determine the guilt of individual officers or groups of officers. For another, they express nothing about section 116, as opposed to the many other provisions of the Reform Act. And in any event, "isolated statements" by a single legislator, even if revealing a punitive intent, cannot turn an otherwise valid law into an unconstitutional bill of attainder absent evidence that other legislators shared the desire to punish. *See Kaspersky*, 909 F.3d at 464. The union offers no such evidence here.

The FOP's attempt to rehabilitate its Contract Clause claim also would fail. The proposed complaint alleged that the disciplinary procedures negotiated in article 12 of the 2017 Agreement were important to the union. That may be so, but the union could not reasonably have expected its agreement to forever limit the legislature's power to adjust the scope of collective bargaining.

15

Finally, the proposed complaint would not salvage the substantive due process claim, for none of its new allegations materially undercuts the analysis we have set forth above.

IV

The district court correctly concluded that the FOP's constitutional claims lack merit.

*Affirmed.*